IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

**DARNELL BALDWIN**                                                             **PETITIONER**

**v.**                                                                        **No. 1:02CV357-D-D**

**ROBERT JOHNSON, ET AL.**                                        **RESPONDENTS**

## MEMORANDUM OPINION

This matter comes before the court on remand from the Fifth Circuit Court of Appeals. This court entered a final judgment in this *pro se* prisoner petition for a writ of *habeas corpus* under 28 U.S.C. § 2254, finding none of the grounds in the petition to have merit. The court also denied the petitioner's request for a certificate of appealability. The Fifth Circuit remanded the case on the petitioner's ten claims of ineffective assistance of counsel; the Fifth Circuit directed this court to set forth its rationale for finding that no violation of federal law had occurred or that the state supreme court's decision was not based on an unreasonable determination of the facts in light of the evidence presented. The Magistrate Judge issued a supplemental Report and Recommendation setting forth the reasons for the court's initial findings. The petitioner objected to the supplemental Report and Recommendation; the state did not. The matter is ripe for review. For the reasons set forth below, the court finds that the petitioner's claims of ineffective assistance of counsel are without merit. Therefore, the state supreme court's decision was not based on an unreasonable determination of the facts in light of the evidence presented, and the instant petition for a writ of *habeas corpus* shall be dismissed.

## Summary of the Evidence[1]

Elizabeth Dill was abducted from her home during the night of April 5, 1996. She had been treated for severe back pain in the days immediately before her disappearance; indeed, she had been reduced to crawling on the floor to move from room to room in her home. Because of her pain and the effects of her medications, her toddler daughter was staying at the home of Elizabeth Dill's mother. Elizabeth's husband, Bryan, had spent the night with his girlfriend at a cabin called "The Shack." He reported Elizabeth missing the following morning. On April 9, 1996, her naked body was found. She had been shot in the head. The skin had been cut from her face. One of her breasts and much of the skin on her chest had been cut away in a gruesome procedure the medical examiner estimated to take approximately forty-five minutes.

The victim's husband spent the night at The Shack with his girlfriend and some hunting buddies. On the night of the victim's disappearance, Darnell Baldwin ("Baldwin") and his brother Clint went to The Shack for a period of fifteen to twenty minutes. Baldwin drove his Monte Carlo, which had a noisy muffler. One or both of the brothers talked to Elizabeth Dill's husband Bryan Dill. Witnesses reported hearing a car with no muffler – or a noisy muffler – at the victim's home that night. Baldwin returned to The Shack in the early morning hours, but did not get out of his car the second time; nor did he speak with Bryan Dill again. Sheriff's deputies went to talk to Baldwin because he had been at The Shack the night the victim disappeared. Baldwin fell under suspicion during the interview because he was chain smoking, visibly shaking, sweating and trembling (SCR. v.11 p. 648). He refused three requests from the deputies

---

[1]The court summarizes the evidence in this memorandum opinion for the sake of clarity and continuity of the following discussion. This summary is substantially the same as the summary in the Magistrate Judge's Supplemental Report and Recommendation.

to look into his Monte Carlo ( SCR v.11 p. 692-3). The deputies left the Baldwin home because they were out of range of radio and cell phone communication. When they returned five or six minutes later, Baldwin and the Monte Carlo were gone (SCR. v. 11 p. 653).

On April 12, 1996, Baldwin was arrested on an unrelated armed robbery charge. A large burned-out spot of grass was seen in the back yard (SCR. v.11 p. 657). After being read his Miranda rights, he told several conflicting stories about the location of his car. Indeed, he rode around with officers, leading them on a wild goose chase looking for the car. The police later discovered that Baldwin had driven his car to his friend Richard Jones's house on April 10, 1996, claiming that something was wrong with the car and that he wanted Jones to look it over. Baldwin made bail on April 15, 1996 (SCR. v.1 p. 11). Jones testified that on April 16 or 17, 1996, he returned to his home to find Baldwin's car gone. Baldwin's attorney reported the car stolen on April 17. In August 1996, the burned out shell of the car, with the keys in the trunk lock, was recovered just over the state line in Alabama – about four miles from Baldwin's home (SCR. v. 11 p. 662-3, 666, 676, 678). One deputy, who had a background as a mechanic, testified that when he first saw Baldwin's car during the interview, it had four after-market multi-spoke wheels and extra wide tires on the back (SCR v. 11 p. 644-647). The burned out remains of the Monte Carlo had all four tires in the narrower width on three factory rims and one Pontiac honeycomb rim ( SCR. v. 11 p. 673-678).

Lonnie Harris, a jailhouse snitch, testified that Baldwin told him that he had personally burned the car with gasoline. Harris claimed that Baldwin confessed to having raped, murdered and mutilated a woman. Baldwin was reportedly paid $1,000.00 by her husband to do so. Semen recovered from the victim's body was subjected to DNA testing. Baldwin was not

-3-

excluded. The genotype, according to the state's expert microbiologist Anne Montgomery, occurs in only one out of every 19 million black Americans. After hearing the testimony of the state's DNA expert, the petitioner's counsel decided against putting on a DNA expert as a witness for the defense. Baldwin was found guilty of capital murder and sentenced to life imprisonment without the possibility of parole.

### The Petitioner's Claims of Ineffective Assistance of Counsel

The petitioner has set forth ten claims of ineffective assistance of counsel, and the Magistrate Judge has discussed each of the ten claims in detail. The petitioner alleges the following failures by trial or appellate counsel[2]:

1. Failure to object to the prosecutor's improper use of challenges for cause and peremptory challenges during jury selection to exclude all black jurors;

2. Failure to subpoena Jim Hancox and call him as a witness at trial to testify that he did not see a woman's body when he looked inside the petitioner's car the morning of the victim's disappearance;

3. *Failure to prepare and file a reply brief on direct appeal to the Mississippi Supreme Court;*

4. Failure to argue at trial that the victim's body was found with Caucasian hair on its left hand;

5. Failure to raise as an issue on direct appeal the trial court's denial of a directed verdict because the state had not proved forcible rape;

6. *Failure to raise a Fourth Amendment objection because the state had no warrant to*

---

[2]The claims the court will discuss further have been placed in bold and italic print.

*obtain hair and blood samples for DNA testing from the petitioner;*

7.	Failure to seek suppression of the testimony of jailhouse snitch Lonnie Harris because Harris gave false testimony to receive leniency on six pending counts of house burglary and robbery;

8.	Failure to seek a new trial based upon the testimony of Armstrong Walters, the attorney for Lonnie Harris, regarding the unrelated case of Shawn Stallings;

9.	Failure to seek a new trial based upon the state's improper voir dire during which the state mentioned the possibility that others might have been involved in the crime;

10.	Failure during *voir dire* to explore in detail whether potential jurors with law enforcement ties could be fair.

## Legal Standard for Ineffective Assistance of Counsel

"To establish ineffective assistance of counsel, a petitioner must show that (1) his counsel's performance was deficient and (2) the deficient performance prejudiced his defense." *Pitts v. Anderson*, 122 F.3d 275 (1997); *see Strickland v. Washington*, 466 U.S. 668, 687 (1984). The deficiency determination is not unguided. "A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. The court is not to analyze counsel's actions with the crystal clarity of hindsight, but rather to judge his decisions in a "highly deferential" manner. *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994); quoting *Strickland*, 466 U.S. at 689. If counsel's performance is deemed to have been deficient, "then [the court] must determine whether there exists a reasonable probability that but for the

complained-of error the outcome of the trial or appeal would have been different." 122 F.3d at 279 (quoting *Sharp v. Johnson*, 107 F.3d 282, 286 n.9 (5th Cir. 1997)).

## Discussion

The court shall adopt the Magistrate Judge's findings of fact and conclusions of law for eight of the ten claims: claims One, Two, Four, Five, Seven, Eight, Nine, and Ten. The Magistrate Judge's rulings on the remaining claims, numbers Three and Six will also be adopted while incorporating the discussion below.

### Claim Six - Warrantless Taking of Hair and Blood Samples

In claim six the petitioner alleged that during his detention after arrest for armed robbery, the state took samples of hair and blood from him without the benefit of a warrant. The court directed the parties to brief this issue further. The warrant at issue was mentioned in the record (SCR Vol. 10, p. 503) but could not be found there. The petitioner's trial counsel had objected to the warrant, but the trial court did not hold a hearing on that objection. This court issued an order on February 16, 2006, directing the state to locate and produce the warrant and all accompanying papers in order to supplement the record. The state provided the warrant and papers on April 25, 2006, and the court has supplemented the record to include the missing warrant. On June 1, 2006 the petitioner submitted a response and brief in opposition to supplementation of the record with the warrant and papers.

The petitioner's claim that the warrant for his hair and blood did not exist was obviously false, as the state has now produced it. As such, the petitioner's argument that the search was conducted without a warrant must fail. The petitioner has also, however, challenged the validity of the warrant – as did his trial counsel. Therefore, in the interest of judicial efficiency, the court

shall address that issue.

The warrant and accompanying statement outlined the facts that had been uncovered during the investigation through April 30, 1996, including:

(1) gruesome details of the victim's manner of death and mutilated body,

(2) the petitioner's bizarre and agitated behavior during his initial interview,

(3) the petitioner's contact with the victim's husband (another suspect in the case) *twice* in the nighttime and early morning hours surrounding the victim's disappearance,

(4) the petitioner's ownership of a Monte Carlo with a loud muffler,

(5) the sounds of a loud muffler at the victim's house the night of her disappearance,

(6) the petitioner's refusal three times to permit police officers to look inside the Monte Carlo,

(7) the "disappearance" of the Monte Carlo from the petitioner's residence mere minutes after the police asked to look inside it,

(8) the petitioner's actions in leading the police on wild goose chase to find the Monte Carlo – coupled with evidence that the petitioner knew where the Monte Carlo was all along,

(9) the petitioner's driving of the "missing" Monte Carlo the day after he made bail,

(10) the report by the petitioner's attorney (on behalf of the petitioner) that the Monte Carlo had been stolen,

(11) the petitioner's cleaning and vacuuming of the Monte Carlo the Saturday after the victim disappeared,

(12) the petitioner's sleeping in the Monte Carlo at a friend's house on the night the victim disappeared, and

(13) the presence of semen, in quantity sufficient for DNA testing, in the victim's vaginal vault.

In order to establish probable cause for a search warrant, substantial evidence must support: (1) that the items sought are connected with criminal activity, and (2) that the items will be found in the place to be searched. *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). In cases like the present one involving the search of a person, there must also be a belief that the person to be searched is connected with criminal activity. *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). The Supreme Court has upheld the use of a search warrant to take blood from a suspect involuntarily, *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and, obviously, the taking of hair samples is far less intrusive than the taking of blood. The warrant in question listed as the place to be searched "The Body of Darnell Baldwin B/M, SSN [***-**-]3958, 6'-0, 220 lbs., black hair and brown eyes;" thus, clearly the blood and hair of Darnell Baldwin could be found at the place to be searched. The remaining question is whether substantial evidence existed to show that the blood and hair sought – and, indeed, Darnell Baldwin himself – were connected with criminal activity. The court finds that such evidence did exist; it can be found in the affidavit supporting the warrant.

The petitioner was seen conversing with another suspect in the murder (the victim's husband – who was spending the night with his girlfriend) twice during the night of the victim's disappearance. The petitioner was driving a 1975 Monte Carlo with a loud muffler, and he was seen driving that car in the vicinity of the victim's house that night. A witness stated that he heard a car with a loud muffler pull into the victim's driveway the night of her disappearance. Of

the many witnesses interviewed about the murder, the petitioner was the only one not to cooperate, and he became extremely agitated when questioned – trembling, sweating, and chain smoking. He was visibly shaken by the questioning. Three times during the interview he adamantly refused requests by the police to look inside the Monte Carlo, leading the police to believe that he had something to hide. The police then departed to call for backup (because they were out of communication range), and the petitioner drove away in the Monte Carlo before the police returned minutes later. The petitioner refused to tell police where the car was, stating that his girlfriend had it – but he could not remember where is girlfriend lived. He led the police on a wild goose chase to find the "missing" car. He slept in the Monte Carlo at a friend's house the night the victim's body was found. He thus intentionally hid the car from the police. Finally, semen in sufficient quantity for DNA testing was recovered from the victim's vaginal vault.

While the evidence adduced *at the time of the warrant* would not have been sufficient to sustain the petitioner's conviction, it was more than mere suspicion, and it was enough to establish probable cause support the warrant to retrieve blood and hair samples from the petitioner for DNA testing. The petitioner argues that his attorneys should have pursued their challenge to the warrant more vigorously – and that their failure to do so constitutes ineffective assistance of counsel. In light of the court's holding that probable cause existed to support the warrant, the court finds that the petitioner was not prejudiced by the actions of his attorneys in this regard. As such, his claim of ineffective assistance of counsel must fail. *Strickland v. Washington*, 466 U.S. 668 (1984)

**Claim Three: Failure of Defense Counsel to File a Reply Brief
During the Direct Appeal of the Petitioner's Conviction and Sentence**

The petitioner's counsel did not file a reply brief during the direct appeal of the petitioner's conviction, either through a mishap with the mail or a miscommunication between the petitioner's two attorneys. First, there is no requirement for the appellant to file a reply brief under state law. The court adds, however, that counsel appealing a capital conviction would be prudent to file a reply brief. The court therefore finds that counsel's performance on direct appeal was deficient.

The petitioner has not, however, set forth what arguments might have been put in the reply brief that would have changed the outcome of the appeal. Despite the petitioner's assertions to the contrary, the evidence against him at trial was overwhelming. Although the case against him would have been weak without DNA evidence, that evidence put the state's case on rock-solid ground. Only one black American *out of 19 million* has a genotype matching the petitioner's. The attacker who deposited semen inside the victim shared that rare genotype with the petitioner. Acknowledging that the field of potential attackers is again cut in half when females (who obviously do not produce semen) are excluded from consideration – the true field of potential attackers can be limited to *one out of 19 million black **males***. Thus, the probability that some black male *other than the petitioner* deposited the semen in the victim is one in 19 million. The other circumstantial evidence weighed heavily against the petitioner, as well: the petitioner's presence in the vicinity of the crime near the time it happened; his bizarre behavior during questioning; his actions in hiding the Monte Carlo from the police and leading them on a wild goose chase to find it; the presence of the burned-out shell of the petitioner's Monte Carlo

some four miles from his house with the keys in the trunk; and the testimony of the jailhouse snitch that the petitioner confessed to the crime and to burning the vehicle to destroy evidence of the crime. The evidence against the petitioner was simply too great for the defense to overcome.

The petitioner's attorneys performed admirably in conducting a defense; they vigorously challenged the prosecution's case at its weakest points – and even mounted a challenge to the prosecution's strongest support – the DNA evidence. In the end, however, the state's case against the petitioner was too strong. The court cannot say that "there exists a reasonable probability that but for the complained-of error [failure to file a reply brief] the outcome of the trial or appeal would have been different;" as such, the petitioner's ineffective assistance of counsel claim regarding counsel's failure to file a reply brief must fail. *Pitts*, 122 F.3d at 279 (quoting *Sharp v. Johnson*, 107 F.3d 282, 286 n.9 (5th Cir. 1997)).

In sum, the court hereby approves and adopts the Magistrate Judge's Report and Recommendation. The court finds that no violations of federal law occurred in the rulings of the state courts, and the decision of the Mississippi Supreme Court was not based upon an unreasonable determination of the facts in light of the evidence presented. The claims of ineffective assistance of counsel in this case shall thus be dismissed. A final judgment consistent with this memorandum opinion shall issue today.

**SO ORDERED,** this the 22nd day of August, 2006.

/s/ Glen H. Davidson
CHIEF JUDGE